UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| SMA, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>CHIEF INDUSTRIES, INC., and DYER CONSTRUCTION COMPANY OF AMERICA,<br><br>Defendants. | 3:17-CV-03021-RAL<br><br>OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT |

SMA, LLC (SMA) sued Chief Industries, Inc. (Chief Industries) and Dyer Construction Company of America (Dyer Construction) after SMA through its insurance carrier paid $786,635.65 associated with damages to a grain storage facility and its contents. SMA alleges that central support columns designed, manufactured, and supplied by Chief Industries and installed by Dyer Construction failed causing damage at a South Dakota Wheat Growers Association (SDWG) location where SMA had served as general contractor. Doc. 1. Chief Industries filed a motion for summary judgment, Doc. 28, seeking summary judgment on the two counts—one for breach of contract and one for negligence—alleged against Chief Industries. This Court held a motion hearing on March 3, 2020, to hear argument for and against the motion, and now grants in part and denies in part Chief Industries' motion for summary judgment.

I.  **Material Facts in the Light Most Favorable to SMA**

SMA is a Minnesota corporation with its principal place of business in Minnesota. Doc. 38 at 1. Chief Industries is a Delaware corporation with is principal place of business in Nebraska.

1

Doc. 38 at 1. Dyer Construction is an Indiana corporation with its principal place of business in Indiana. Doc. 1. There is complete diversity of citizenship with more than $75,000 at issue in the case, and thus federal jurisdiction under 28 U.S.C. § 1332. Doc. 1.

SDWG hired SMA as a general contractor for a project at a SDWG site in Kennebec, South Dakota. Doc. 44 at 1. Part of SMA's contract with SDWG involved the construction of a large grain storage building. Doc. 44 at 1–2. SDWG, as the owner, specified the capacity of grain storage which it desired. Doc. 44 at 1. SMA then laid out different sizes and shapes for the possible storage facility. Doc. 38 at 7; Doc. 44 at 1.

SMA contacted Chief Industries for a quote on the grain storage building, in part because SMA and Chief Industries had done business previously. Doc. 38 at 2. The Chief Industries' website, among other things, stated: "Since 1966, Chief Buildings has designed and manufactured a wide variety of construction solutions for customers located throughout the United States. Specific applications include manufacturing, commercial, community, and agricultural buildings. Each structure is designed to meet the specific needs of the customer." Doc. 38 at 9; Doc. 44 at 5–6. An SMA representative shared its sketches of the SDWG facility with a representative of Chief Industries. Doc. 38 at 7–8. SMA itself does not employ engineers but hires engineers as third-party contractors; SMA apparently did so with regard to the foundation, but not the design or erection of, the SDWG grain storage building in Kennebec. Chief Industries has engineers in house, but does not hold itself out as an engineering firm. Chief Industries provided to SMA a preliminary sketch of a Chief Industries design of a grain storage building, together with a quote for the components of the building. Doc. 38 at 8; Doc. 44 at 3. SMA characterizes the building as being "pre-engineered" by Chief Industries, but Chief Industries points to a contract term that specifically states: "Buyer [SMA] acknowledges that Chief is not the architect or engineer of

record for Buyer's project." Doc. 32-3 at 9. SMA maintains that it relied on Chief Industries for design of the pre-engineered building, appropriate load calculations, the specific design of the building, the anchor rod drawings, the preliminary drawings, and the final engineered drawings. Doc. 38 at 8–9.

On February 10, 2015, SMA and Chief Industries entered into an Agreement to Purchase where SMA agreed to buy components for the grain storage building for a purchase price of $571,312, plus pay for freight of $22,986 for shipping from Chief Industries' facility in Grand Island, Nebraska, of the approximately 621,669 pounds of building components. Docs. 32-3 at 8, 10; 32-1 at 8, 10. SMA selected Dyer Construction from a list of Chief Industries' approved installers to assemble the components into the grain storage building, and Dyer Construction separately invoiced SMA for its service of assembling the components into the grain storage building.

The Agreement to Purchase between SMA and Chief Industries was written by Chief Industries and has terms favorable to Chief Industries. Doc. 32-1. Paragraph 9 of the Terms and Conditions of the Agreement to Purchase states in relevant part:

> Although Chief may furnish drawings to Buyer, Buyer acknowledges that Chief is not the architect or engineer of record for Buyer's project. Buyer shall be solely responsible for: ... (iv) assuring that said load and code requirements comply with the requirements of Buyer's customer and all applicable federal, state and/or local statutes, laws or ordinances and all rules, regulations and codes (including building codes) promulgated, adopted or issued thereunder; ... (vi) assuring that any requirements Buyer may have with respect to the quantities, materials, dimensions and tolerances of the Components ... are accurately set forth in this Agreement ...; and (vii) assuring that all Components manufactured by Chief in conformity therewith are merchantable and are otherwise fit for Buyer's intended purpose or use. Chief's sole responsibility shall be to manufacture the Components in conformity with the written load and code requirements provided to Chief by Buyer; the approved drawings, if any, and otherwise in conformity with this Agreement.

Doc. 32-1 at 9. The Agreement to Purchase in its Terms and Conditions also contains a disclaimer of warranties in Paragraph 11 as follows:

> The Components furnished to Buyer pursuant to this Agreement are covered by the Limited Warranties listed in this Agreement. Buyer expressly acknowledges and agrees that: (i) said Limited Warranties are an integral part of this Agreement; (ii) Buyer accepts said Limited Warranties as the sole and only warranties given by Chief to Buyer with respect to the Components; and (iii) said Limited Warranties are reflected in the Purchase Price. EXCEPT AS IS OTHERWISE EXPRESSLY SET FORTH IN THE LIMITED WARRANTIES LISTED IN THIS AGREEMENT, CHIEF MAKES NO OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE WITH RESPECT TO ANY GOODS OR SERVICES SOLD OR PROVIDED TO THE BUYER PURSUANT TO THIS AGREEMENT, INCLUDING WITHOUT LIMITATION ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE.

Doc. 32-1 at 10.

The Standard Limited Warranty supplied by Chief Industries and received (although not signed for) by SMA contained a warranty for a period of five years that "[t]he components were free from defects in the composition of material and workmanship and were in accordance with industry standards for such components." Doc. 32-4. However, the Standard Limited Warranty contained in Paragraphs 3, 4, and 5 has the following language:

> By purchasing the Chief components, you and Chief Industries, Inc., expressly agree to an allocation of the risks of component failure between you and Chief. This allocation is recognized by both you and Chief and is reflected in the price of the components you purchased.
>
> If a defect in any component covered by this limited warranty is discovered within the time period and reported in the manner provided in this limited warranty, Chief will supply replacement parts F.O.B. Chief Industries, Inc., Grand Island, Nebraska.
>
> The obligations stated in the preceding paragraph are the SOLE AND EXCLUSIVE REMEDIES available from Chief in the event of issues with the components manufactured by Chief. Chief will not be liable for the costs of dismantling defective components or installing replacement components, and Chief will not be

liable for any special, incidental or consequential damages based upon breach of contract, negligence, strict liability in tort, or any other legal theory.

Doc. 32-4 at 1. Paragraphs 7 and 8 of the Standard Limited Warranty in relevant part provide:

> THIS LIMITED WARRANTY IS THE COMPLETE AND EXCLUSIVE AGREEMENT BETWEEN YOU AND CHIEF INDUSTRIES, INC., CONCERNING THE ALLOCATION OF THE RISKS OF DAMAGE OR LOSS ARISING FROM COMPONENT FAILURE. It supersedes all prior agreements, whether written or oral, and all other communications between you and Chief concerning the allocation of those risks.
>
> ...
>
> THIS LIMITED WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.
>
> THIS LIMITED WARRANTY ALLOCATES THE RISK OF DAMAGE OR LOSS ARISING FROM PRODUCT FAILURE BETWEEN CHIEF INDUSTRIES, INC., AND THE PURCHASER. THIS ALLOCATION IS RECOGNIZED BY BOTH PARTIES AND WAS REFLECTED IN THE PURCHASE PRICE OF THE GOODS.

Doc. 32-4 at 2.

The Terms and Conditions of the Agreement to Purchase between SMA and Chief Industries likewise contain a limitation on liability and damages provision in Paragraph 12 that "CHIEF SHALL NOT, UNDER ANY CIRCUMSTANCES, BE LIABLE TO THE BUYER, THE BUYER'S CUSTOMER OR ANY THIRD PARTY FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, LIQUIDATED, OR PUNITIVE DAMAGES." Doc. 32-1 at 10. The Terms and Conditions of the Agreement to Purchase make clear that the Agreement supersedes all prior communication and is governed by Nebraska law. Doc. 32-1 at 10. SMA made some changes to the Agreement to Purchase by handwriting on the document. Doc. 32-3. However, none of the changes related to or affected the Terms and Conditions of the Agreement to Purchase or the Standard Limited Warranty. Doc. 32-3.

5

Chief Industries arranged for delivery of the components, and Dyer Construction assembled the components into the grain storage building during 2015. The building was supported by a series of internal columns designed, manufactured, and supplied by Chief Industries.

In November 2015, one of the internal columns "failed." Doc. 38 at 9. SMA apparently repaired the column and installed a new base plate. Doc. 38 at 9. There appears to be a genuine dispute of material fact over whether Chief Industries received notice of the November 2015 column failure to trigger its responsibility under the Standard Limited Warranty to supply replacement parts for components with defects in the composition of material and workmanship. SMA claims that Chief Industries was given notice, while Chief Industries disclaims having notice, of the November 2015 column failure.

In October 2016, when the grain storage building had grain within it, there was what SMA characterizes as "a catastrophic failure of the interior columns." Doc. 38 at 9. According to SMA, seven interior columns broke and seven other columns were damaged due to pressures on the columns from grain within the building. Doc. 38 at 10. SMA attributes the column failure to a design flaw by Chief Industries, which Chief Industries contests. Doc. 38 at 10. Upon notification of the column failure, Chief Industries supplied more robust internal columns, which then were installed in the grain storage building. Doc. 38 at 5–6. The grain storage building has continued to be used by SDWG thereafter and through today. SMA invoiced Chief Industries for costs associated with cleanup and repairs, Doc. 32-5, but Chief Industries declined to pay that invoice. SMA seeks payment of $786,635.65 from the Defendants.

## II. Summary Judgment Standard

6

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Mortg. & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). There is a genuine issue of material fact if a "reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007). Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

### III. Discussion

#### A. Count I – SMA's Contract Claim Against Chief Industries

Count I of SMA's complaint alleges breach of contract against Chief Industries. The Terms and Conditions of the Agreement to Purchase between SMA and Chief Industries specifies that Nebraska law applies to that contract. Doc. 32-1 at 10.

SMA and Chief Industries in briefing disagreed over whether the agreement is governed by the Nebraska Uniform Commercial Code (UCC). The UCC as adopted in Nebraska defines

7

"goods" in § 2-105 as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action." Article 2 of the UCC as adopted in Nebraska in turn depends on whether a sale is a "transaction in goods." Hammond v. Streeter, 406 N.W.2d 633, 635–36 (Neb. 1987). Chief Industries points to the language of the contract being one for goods in the form of components for a building in which SMA is the "Buyer." SMA maintains that part, and indeed the majority, of what SMA bought from Chief Industries was the design and engineering of the building.

The Nebraska Supreme Court has adopted principles similar to those in the seminal case of Bonebrake v. Cox, 499 F.2d 951 (8th Cir. 1974), in determining whether a mixed sale of goods and services falls within the UCC. See Hammond, 406 N.W.2d at 635–36; O'Keefe Elevator Co., Inc. v. Second Ave. Properties Ltd., 343 N.W.2d 54, 56 (Neb. 1984). Under Nebraska law:

> The test for inclusion in or exclusion from the sales provisions is not whether the contracts are mixed but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved, or whether they are transactions of sale, with labor incidentally involved.

Mennonite Deaconess Home & Hosp. Inc. v. Gates Eng'g Co., Inc., 363 N.W.2d 155, 160 (Neb. 1985); see also R.M. Campbell Indust., Inc. v. Midwest Renewable Energy, LLC, 886 N.W.2d 240, 256 (Neb. 2016). In R.M. Campbell, the Nebraska Supreme Court applied this "predominant purpose" test to a contract for goods and services involving expansion of an ethanol plant. R.M Campbell, 886 N.W.2d at 255–56. The Court in R.M. Campbell noted that "[t]he U.C.C. applies when the principal purpose of the transaction is the sale of goods, even though in order for the goods to be utilized, some installation is required. On the other hand, if the contract is principally for services and the goods are merely incidental to the contract, the provisions of the U.C.C. do

not apply." Id. at 256 (footnote omitted). The Nebraska Supreme Court in R.M. Campbell then reasoned as follows:

> The total original contract was for $2,411,431.02. From examining that contract, over one-half of the total contract appears to be for goods, with the remainder for services. As such, we conclude that this contract was predominantly for the sale of goods and that the U.C.C. controls.

Id.

The R.M. Campbell case presented a much closer call on the predominant purpose of the transaction than does this case. First, the building components supplied by Chief Industries clearly were movable. See Hammond, 406 N.W.2d at 635 ("The definition of 'goods,' as used in article 2, stresses the element of 'movability' of the item in question."). Chief Industries shipped the components from Nebraska to Kennebec, South Dakota, for assembly into a building erected by Dyer Construction working on behalf of SMA. Building components can constitute goods under the UCC within Nebraska law. See R.M. Campbell, 886 N.W.2d at 255–56; Murphy v. Spelts-Schultz Lumber Co. of Grand Island, 481 N.W.2d 422, 428–29 (Neb. 1992) (trusses involved in house collapse were goods covered under the UCC); Mennonite Deaconess, 363 N.W.2d at 161 (roofing material constitutes goods under the UCC). Second, the purchase price contains no allocation for services whatsoever, Chief Industries did not actually assemble the building onsite to provide that service, and the purchase price of $571,312, plus freight of $22,986, for 621,669 pounds of building components suggests the primary thrust of the agreement to be one for the purchase of components by SMA from Chief Industries. Finally, the language of the contract itself refers to SMA as a "Buyer" (rather than a client of services) and explicitly disclaims in Paragraph 9 of the Terms and Conditions that Chief Industries is acting as an architect or engineer of record for SMA's project. Doc. 32-3. The result would be the same if South Dakota law were to apply to the contract. See Jandreau v. Sheesley Plumbing & Heating Co., Inc., 324 N.W.2d 266, 269–

9

70 (S.D. 1982) (applying "predominant purpose test" to determine that sale and installation of irrigation system was governed by the UCC).

Under Nebraska law, a merchant of a good may disclaim warranties and limit warranties to "repair and replacement." Koperski v. Husker Dodge, Inc., 302 N.W.2d 655, 664–65 (Neb. 1981). In Koperski, the Nebraska Supreme Court recognized that "repair and replacement" clauses "have become the basic mechanism by which manufacturers limit or avoid liability in actions for breach of warranty." Id. at 664. The court then noted the "general rule" "that language of a warranty limiting the buyer's remedies to repair or replacement of defective parts is not, on its face, unconscionable." Id. at 665. The United States Court of Appeals for the Eighth Circuit, in a case applying Minnesota law, summarized the rationale for this rule as follows:

> The U.C.C. encourages negotiated agreements in commercial transactions, including warranties and limitations. It is at the time of contract formation that experienced parties define the product, identify the risks, and negotiate a price of the goods that reflects the relative benefits and risks to each. An exclusion of consequential damages set forth in advance in a commercial agreement between experienced business parties represents a bargained-for allocation of risk that is conscionable as a matter of law.

Transp. Corp. of Am., Inc. v. Int'l Bus. Machs. Corp., Inc., 30 F.3d 953, 959–60 (8th Cir. 1994) (cleaned up to omit citations and quotes).

In the Terms and Conditions of the Agreement to Purchase, Paragraph 11 makes clear that "said Limited Warranties are reflected in the Purchase Price." Similarly, the Standard Limited Warranty, in Paragraph 3 provides: "By purchasing the Chief components, you and Chief Industries, Inc., expressly agree to an allocation of the risks of component failure between you and Chief. This allocation is recognized by both you and Chief and is reflected in the price of the components you purchased." Doc. 32-4. Both the Terms and Conditions and the accompanying Standard Limited Warranty make clear that Chief Industries limited SMA's remedy to repair and

replacement of a defective component. Docs. 32-1 at 10; 32-4. Chief Industries did supply more robust center columns after the October 2016 failure of a series of columns within the grain storage building consistent with its limited warranty.

There remains, however, a question of fact that prevents entry of summary judgment on Count I for Chief Industries. The parties dispute whether Chief Industries received notice of the initial column failure that occurred in November 2015. If Chief Industries did receive notice of a defect in a component and failed to repair and replace the component within its responsibilities under the Limited Warranty, then the warranty may have failed of its essential purpose. Under Nebraska law, "[w]here the seller is given a reasonable chance to correct defects and the equipment still fails to function properly, the limited remedy of repair or replacement of defective parts fails of its essential purpose." John Deere Co. v. Hand, 319 N.W.2d 434, 437 (Neb. 1982). If the repair and replace warranty fails of its essential purpose, the buyer may then invoke remedies available under the UCC, including claims for breach of warranties of merchantability or fitness for a particular purpose. Id. Likewise, the buyer is not blocked from seeking consequential damages, despite language in the warranty precluding such damages. Id. In John Deere Co. v. Hand, the Nebraska Supreme Court concluded that there was a question of fact as to whether a limited warranty had failed of its essential purpose when there was some evidence that John Deere Company may not have effectively performed its obligation to repair the equipment within a reasonable time. Id. at 438.

As fate would have it, Chief Industries is painfully aware of this rule. In Arabian Agriculture Services Co. v. Chief Industries, Inc., 309 F.3d 479 (8th Cir. 2002), the United States Court of Appeals for the Eighth Circuit affirmed a grant of judgment as a matter of law to the entity suing Chief Industries and concluded that Chief Industries' warranty provisions limiting the

11

buyer to repair or replacement of a defective component and disclaiming responsibility for consequential damages were unenforceable where Chief Industries had disclaimed any responsibility for silo collapses at the buyer's facility in Saudi Arabia. After observing that the Nebraska UCC permits contracting parties to restrict damages to repair and replacement, the Eighth Circuit noted the limitation in UCC § 2-719(2) providing that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in the Uniform Commercial Code." Id. at 485 (alteration in original) (quoting Neb. Rev. Stat. U.C.C. § 2-719(2)). The Eighth Circuit concluded that Chief Industries' refusal to repair or replace the silos made the warranty fail of its essential purpose and precluded Chief Industries from sheltering itself later by invoking the warranty's damage limitations. Id. at 486. Of course, the situation with the center column failures at the Kennebec SDWG facility is different, and Chief Industries after October 2016 did supply sturdier center columns that remain in the structure. However, a question of fact remains whether Chief Industries failed to honor the warranty after allegedly receiving notice eleven months previously in November 2015 of a failure of one of the center columns. Because there is a question of fact on the alleged breach of contract by Chief Industries, the summary judgment motion on Count I must be denied.

### B. Count II – SMA's Negligence Claim Against Chief Industries

#### 1. South Dakota law governs SMA's tort claims.

In Count II of the complaint, SMA alleges that Chief Industries breached a duty of reasonable care "by under designing the columns and the failure to use the proper sized columns." Doc. 1 at 3. The first question to address in analyzing that claim is which state's law governs the claim.

12

Paragraph 14 of the Terms and Conditions of the Agreement to Purchase states in part: "This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Nebraska, USA." Doc. 32-1 at 10. This is what is considered to be a narrow choice of law provision, as opposed to a broad choice of law provision that would subject any and all claims of any nature between the parties to a particular state's law. See Inacom Corp. v. Sears, Roebuck & Co., 254 F.3d 683, 687 (8th Cir. 2001); Heating & Air Specialists, Inc. v. Jones, 180 F.3d 923, 930 (8th Cir. 1999). The contract language does not state that all claims between SMA and Chief Industries are governed by Nebraska law, but only that "[t]his Agreement shall be governed by … laws of the State of Nebraska." Doc. 32-1 at 10. This Court must turn to a choice of law analysis in determining which forum state's law governs noncontract claims between SMA and Chief Industries.

In diversity jurisdiction cases, such as this one, federal courts apply the choice of law rules of the forum state to determine which state's substantive law applies. Allianz Ins. Co. of Can. v. Sanftleben, 454 F.3d 853, 855 (8th Cir. 2006). Thus, in the District of South Dakota, the choice of law rules of South Dakota apply. South Dakota employs the "most significant relationship test" in determining which state's law governs tort claims. Burhenn v. Dennis Supply Co., 685 N.W.2d 778, 784 (S.D. 2004). The factors to be considered in the most significant relationship test are the following: "(a) the place where the injury occurred[;] (b) the place where the conduct causing the injury occurred[;] (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties[;] and (d) the place where the relationship…between the parties is centered." Id.; see also Restatement (Second) of Conflict of Law § 145 (Am. Law Inst. 1971).

The place where the injury occurred—the column failure, grain storage building damage, and consequential damages—is in South Dakota. The place where the conduct causing the injury

occurred might be Nebraska, if indeed the columns failed as a result of some manufacturing or design problem, or might be South Dakota, if the columns somehow failed as a result of something Dyer Construction may or may not have done. The third factor in the most significant relationship test is of little help here; SMA is domiciled in Minnesota, Chief Industries is domiciled in Nebraska, and Dyer Construction is domiciled in Indiana. The fourth factor involving where the parties' relationship is centered plainly points to applying South Dakota law. The "most significant relationship test" points to applying South Dakota law to noncontract claims, and neither SMA nor Chief Industries disputed that at the motion hearing.

### 2. The economic loss rule applies to Count II.

The Supreme Court of South Dakota in City of Lennox v. Mitek Industries, Inc., 519 N.W.2d 330 (S.D. 1994), adopted the economic loss rule in UCC cases. Id. at 333. In brief, in cases under the UCC, "economic losses are not recoverable under tort theories; rather, they are limited to the commercial theories found in the UCC." Id. (citing Agristor Leasing v. Spindler, 656 F. Supp. 653 (D.S.D. 1987)). In adopting the economic loss rule, the Supreme Court of South Dakota in City of Lennox recognized two exceptions to the general rule—when personal injury is involved and "when the damage is to 'other property' as opposed to the specific goods that were part of the transaction." Id. The court cited two examples of damage to other property: "1) defective heater that exploded and destroyed a major portion of a refinery; 2) defective brakes that hypothetically caused [a] truck to run into home." Id. (footnote omitted). However, the court made clear that the economic loss rule barred tort claims "[w]hen a defect in a component part damages the product into which that component was incorporated." Id. For instance, in City of Lennox, a defect in trusses that forced the City to remove insulation, sheet metal, and other parts of the

building to which they had been incorporated did not cause damage to "other property." Id. at 333–34.

In two cases decided after City of Lennox, the Supreme Court of South Dakota elaborated on the economic loss rule. In Diamond Surface, Inc. v. State Cement Plant Commission, 583 N.W.2d 155 (1998), the court stated the economic loss rule's principle that "purely economic interests are not entitled to protection against mere negligence." Id. at 160 (quoting Bamberger & Feibleman v. Indianapolis Power & Light Co., 665 N.E.2d 933, 938 (Ind. Ct. App. 1996) and citing other authority and cases). In Diamond Surface, the court made clear that the economic loss rule barred tort claims even when there were consequential losses resulting from the buyer's inability to make use of an effective product, including such things as lost profits and increased time and labor. Id. at 161–62. Thereafter in Jorgensen Farms, Inc. v. Country Pride Cooperative, Inc., 824 N.W.2d 410 (S.D. 2012), the Supreme Court of South Dakota applied the economic loss rule in a situation where a defective component of fertilizer (urea) was incorporated into the fertilizer purchased by Country Pride which damaged a wheat crop, resulting in lost profits. Id. at 418–19. The court concluded that damage to the wheat crop and lost profits were consequential losses and not within the "other property" exception to the economic loss doctrine. Id. at 419.

This Court has applied the economic loss doctrine in a diversity jurisdiction case involving analogous facts. In Corsica Cooperative Ass'n v. Behlen Manufacturing Co., Inc., 967 F. Supp. 382 (D.S.D. 1997), a cooperative sued a business that supplied building components for the construction of a grain storage building after the building suddenly collapsed causing damage to both corn stored inside and two vehicles parked nearby. Id. at 383–84. After determining that the UCC governed the dispute between the cooperative and the manufacturer of the building components, this Court followed a previous decision in the District of South Dakota to concluded

15

that grain stored inside of a defective building was not "other property" within the exception. Id. at 385 (citing Agristor Leasing, 656 F. Supp. at 658). Relying on the City of Lennox case, this Court concluded that the damage to the two nearby vehicles did not take the case outside of the economic loss doctrine under South Dakota law. Id. at 387.

SMA argued in briefing that there was damage to "other property," noting the need to remove and store grain, labor, and down time. The cases of Jorgenson Farms, Corsica Cooperative, and Agristor Leasing make clear that the economic loss rule extends to and bars claims for the sort of consequential damages paid for by SMA. Moreover, in a case involving some of the same entities affected—S.D. Wheat Growers Ass'n v. Chief Indus., Inc., 337 F. Supp. 3d 891 (D.S.D. 2018)—this Court again applied the economic loss doctrine after a building with Chief Industries' components collapsed with grain within it. In South Dakota Wheat Growers, this Court reaffirmed that "[d]amages for grain stored in the bin are consequential damages that would not fall under the 'other property' exception to the economic loss doctrine." Id. at 904.

In the face of the authority making clear that the sort of damages for which SMA and its insurer paid were not "damage to other property" outside the economic loss doctrine, SMA's argument at the motion hearing asserted that Chief Industries had committed professional negligence. SMA cited the South Dakota Wheat Growers case in support of that proposition. Indeed, this Court in South Dakota Wheat Growers recognized "a cause of action also exists for 'economic damage for professional negligence beyond the strictures of privity of contract.'"[1] Id.

---

[1] In Taco John's of Huron, Inc. v. Bix Produce Co., LLC, CIV. 07-4134-KES, 2008 WL 11450655 (D.S.D. Sept. 18, 2008), this Court recognized three exceptions to the economic loss rule: 1) personal injury; 2) damage to other property; and 3) professional negligence actions. 2008 WL 11450655 at *4. This Court in Taco John's of Huron also applied the economic loss doctrine outside of the context of the UCC. Id. at *5; see also Transport Corp., 30 F.3d at 957 (applying economic loss doctrine outside of the context of a UCC case).

16

at 905 (quoting <u>Wells Fargo Bank, N.A. v. Fonder</u>, 868 N.W.2d 409, 416 (S.D. 2015)). This Court in <u>South Dakota Wheat Growers</u>, recognized such a professional negligence claim as being viable against the engineer, Heyer Engineering, P.C., which had allegedly designed the "Big Bin" which had cracked, partially collapsed, and then after being repaired had completely collapsed. <u>Id.</u> at 900, 905. This Court in <u>South Dakota Wheat Growers</u>, however, did not endorse a claim for professional negligence outside of the economic loss doctrine against Chief Industries. <u>Id.</u> at 905.

The undisputed facts in this case are that SMA retained outside engineering assistance when necessary to do so, including when considering the foundation on which to place the grain storage building in Kennebec. SMA no doubt relied on Chief Industries to design and supply components for a building that Dyer Construction could assemble to withstand storage of grain. However, nothing in the Agreement to Purchase makes Chief Industries responsible for engineering services to SMA. To the contrary, Paragraph 9 of the Terms and Conditions to the Agreement to Purchase explicitly states:

> Although Chief may furnish drawings to Buyer, Buyer acknowledges that Chief is not the architect or engineer of record for Buyer's project. Buyer shall be solely responsible for: ... (iv) assuring that said load and code requirements comply with the requirements of Buyer's customer ...

Doc. 32-1 at 9. Chief Industries did not contract with SMA to provide engineering services, unlike Heyer Engineering, P.C. in <u>South Dakota Wheat Growers</u> where a professional negligence claim could survive.

Because no exception to the economic loss rule exists in this case, the economic loss rule applies to SMA's tort claim against Chief Industries and limits SMA to its commercial claims. That is, Chief Industries is entitled to summary judgment on SMA's negligence claim.

### C. Anti-Indemnification Statutes

SMA makes a final argument that Chief Industries cannot disclaim responsibility because of anti-indemnification statutes that exist in Nebraska and in South Dakota. SMA cites to Neb. Rev. Stat. § 25-21, 187(1), which provides in relevant part:

> In the event that a public or private contract or agreement for the construction, alteration, repair, or maintenance of a building, structure, highway bridge, viaduct, water, sewer, or gas distribution system, or other work dealing with construction or for any moving, demolition, or excavation connected with such construction contains a covenant, promise, agreement, or combination thereof to indemnify or hold harmless another person from such person's own negligence, then such covenant, promise, agreement, or combination thereof shall be void as against public policy and wholly unenforceable.

Neb. Rev. Stat. § 25-21, 187(1). The South Dakota anti-indemnification statute is at SDCL § 56-3-18 and provides:

> A covenant, promise, agreement or understanding in, or in connection with or collateral to, a contract or agreement relative to the construction, alteration, repair or maintenance of a building, structure, appurtenance and appliance, including moving, demolition and excavating connected therewith, purporting to indemnify the promisee against liability for damages arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of the promisee, his agents or employees, or indemnitee, is against the policy of the law and is void and unenforceable.

SDCL § 56-3-18.

SMA, however, points to no particular provision in the Agreement to Purchase that these statutes would invalidate. Rather, SMA's argument more generally is that Chief Industries cannot enforce limited warranties or avoid responsibility for its own negligence relating to the grain storage building because of the existence of these statutes.

There are several reasons why the anti-indemnification statutes do not apply here. First, the statutes are concerned with indemnification provisions where a second party is committing to indemnify a first party against damages caused by the sole negligence of the first party. Effectively such provisions make the second party the insurer of all the first party's negligent acts or

18

omissions. There is no such provision in the Agreement to Purchase between Chief Industries and SMA. Second, SMA cites to no authority where either a Nebraska court or a South Dakota court has invoked these provisions to deem limited warranties invalid or to decline to apply the economic loss rule. This Court could find no authority that anti-indemnification provisions such as these apply to transactions for goods under the UCC. The two cases cited in briefing involve circumstances substantially different from the claims at hand. See Chicago & Nw. Transp. Co. v. V & R Sawmill, Inc., 501 F. Supp. 278 (D.S.D. 1980) (dealing with indemnification provision in a lease and license); Omaha Cold Storage Terminals, Inc. v. The Hartford Ins. Co., 8:03-CV-445, 2006 WL 695456 (D. Ne. Mar. 17, 2006) (dealing with a contract of an engineering service company for its services). This Court concludes that the anti-indemnification provisions do not apply under the facts of this case and instead the UCC and the economic loss doctrine apply.

## IV. Conclusion and Order

For the reasons explained above, it is hereby

ORDERED that Chief Industries' Motion for Summary Judgment, Doc. 28, is denied with respect to Count I and is granted with respect to Count II of SMA's complaint.

DATED this 30th day of March, 2020.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE